No. 15-35452

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NORTHWEST SCHOOL OF SAFETY, *et al.*,

Plaintiffs – Appellants,

v.

BOB FERGUSON, *et al.*,

Defendants – Appellees.

Appeal from the United States District Court
for the Western District of Washington

The Honorable Benjamin H. Settle - Dist. Ct. No. 3:14-cv-6026 BHS

## APPELLANTS' OPENING BRIEF

CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP
Steven W. Fogg, WSBA #23528
David B. Edwards, WSBA #44680
1001 Fourth Avenue, Suite 3900
Seattle, WA 98154
(206) 625-8600
sfogg@corrcronin.com
dedwards@corrcronin.com

Donald E. J. Kilmer, Jr.
A Professional Corp.
CA State Bar No.: 179986
1645 Willow Street, Suite 150
San Jose, California 95125
(408) 264-8489
Don@DKLawOffice.com

Mikolaj T. Tempski, WSBA #42896
TEMPSKI LAW FIRM, PS
40 Lake Bellevue Dr., Suite 100
Bellevue, WA 98005
miko@tempskilaw.com

# CORPORATE DISCLOSURE STATEMENTS

Plaintiff PUGET SOUND SECURITY, INC., states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff PACIFIC NORTHWEST ASSOCIATION OF INVESTIGATORS, INC., states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff FIREARMS ACADEMY OF SEATTLE, INC., states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff SECOND AMENDMENT FOUNDATION states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Respectfully submitted this 14th day of September, 2015.

CORR CRONIN MICHELSON BAUMGARDNER FOGG & MOORE LLP

 /s/ Steven W. Fogg
Steven W. Fogg, WSBA #23528
David B. Edwards, WSBA #44680
Attorneys for Plaintiffs-Appellants

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ............................................. ii

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 2

STATEMENT OF THE ISSUES ......................................................... 2

ADDENDUM OF STATUTES............................................................ 2

STATEMENT OF THE FACTS ......................................................... 3

    A.   Plaintiffs Regularly Engaged in the Temporary Non-Commercial Transfer of Firearms As a Necessary Part of Their Lives and Businesses Prior to the Passage of I-594 ........................................... 3

    B.   I-594 Criminalized The Non-Commercial Transfers In Which Plaintiffs Regularly Engaged ............................................................ 4

    C.   Plaintiffs Have Refrained From Engaging in Temporary Non-Commercial Transfers of Firearms Out of a Fear of Prosecution and the Practical Impossibility of Complying with the Law .............. 6

    D.   Washington Officials Have Gone Out of Their Way to Refrain from Enforcing I-594 As Written Or Providing Guidance to Citizens On How They May Avoid Prosecution ................................ 8

    E.   The District Court Dismissed Plaintiffs' Claims for Lack of Standing Without Addressing the Substance of Plaintiffs' Arguments ............................................................................................ 9

SUMMARY OF ARGUMENT ........................................................... 10

STANDARD OF REVIEW ............................................................... 11

ARGUMENT ................................................................................ 11

I.   THE PLAINTIFFS HAVE STANDING BECAUSE THEY
     INTENTIONALLY REFRAIN FROM ENGAGING IN
     ACTIVITY THAT WOULD OTHERWISE BE SUBJECT
     TO PROSECUTION ...............................................................11

  A.   Standing Analysis Differs Where a Plaintiff Specifically
       Refrains from Violating the Law.......................................11

  B.   The Plaintiffs Have Suffered a Concrete, Particularized,
       and Actual Injury .............................................................19

II.  THE DISTRICT COURT ERRED BY REFLEXIVELY
     APPLYING THE TRADITIONAL STANDING ANALYSIS
     AND FAILING TO RECONCILE COMPLEMENTARY
     CASELAW...........................................................................23

CONCLUSION..............................................................................25

STATEMENT OF RELATED CASES.........................................27

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) .....................................................................13

*Arizona Right to Life Political Action v. Bayless*,
 320 F.3d 1002 (9th Cir. 2003) .............................................................................16

*California Pro-Life Council, Inc. v. Getman*,
 328 F.3d 1088 (9th Cir. 2003) ................................................................. 17, 18, 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................................... 20, 28

*Ezell v. City of Chicago*, 651 F.3d 694 (7th Cir. 2011) .........................................20

*Human Life of Washington Inc. v. Brumsickle*,
 624 F.3d 990 (9th Cir. 2010) ........................................................................ 17, 18

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)............22

*Jackson v. City & County of San Francisco*,
 829 F. Supp. 2d 867 (N.D. Cal. 2011)............................................... 11, 21, 25, 28

*King County v. Rasmussen*, 299 F.3d 1077 (9th Cir. 2002) ...................................13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................13

*McGraw v. United States*, 281 F.3d 997 (9th Cir. 2002)........................................12

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ........................... passim

*San Diego County Gun Rights Comm. v. Reno*,
 98 F.3d 1121 (9th Cir. 1996)...................................................................... 19, 28, 29

*Thomas v. Anchorage Equal Rights Comm'n*,
 220 F.3d 1134 (9th Cir. 2000) ...................................................................... passim

*U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) .....................................................20

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) .................... 16, 17, 26

*Valley View Health Care, Inc. v. Chapman*,
   992 F. Supp. 1016 (E.D. Cal. 2014) .................................................................25

## Statutes

18 U.S.C. § 922(b)(3) ............................................................................ 7, 20

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1331 ...................................................................................2

28 U.S.C. §§ 2201 and 2202 ...................................................................2

42 U.S.C. §§ 1983 and 1988 ...................................................................2

RCW 18.170.050 ............................................................................ 4, 11

RCW 9.41.010 ................................................................................. 4, 19

RCW 9.41.092 .......................................................................................4

RCW 9.41.113 ................................................................................. 4, 19

RCW 9.41.115 .......................................................................................4

# INTRODUCTION

The District Court's Order Granting Defendants' Motion to Dismiss [ER Doc # 3, Page 5][1] for lack of standing must be reversed and the case remanded to the trial court for further proceedings. The Washington Statutes [ADD-1 to -10] challenged in this suit criminalize the Plaintiffs' historically common and ordinary practice of the non-commercial transfer of firearms, even if such transfers are temporary and occur for personal safety, as part of safety training and firearm instruction, or as required by other portions of Washington law.

Plaintiffs have standing because they are required to choose between exercising rights protected by the Second Amendment or risk criminal prosecution. Plaintiffs' choice to refrain from engaging in the desired transfers that would violate the law may obviate any immediate threat of prosecution, but it does not erase Plaintiffs' injuries. The District Court relied on an overly-technical, outdated and stunted reading of the Ninth Circuit's standing precedent to conclude otherwise. Plaintiffs are suffering a concrete, particular, and actual injury when their fundamental rights are chilled by threat of prosecution, especially when the challenged policy is vague, ambiguous, overbroad and irrational. Plaintiffs contend that the allegations in the operative complaint set forth the necessary Article III standing, thus providing a federal court with the

---

[1] Further citations to the Excerpts of Record will be formatted ER [Doc#]:[Page#].

necessary case or controversy concerning the constitutionality of the challenged Washington law.

## STATEMENT OF JURISDICTION

Federal question jurisdiction arises under the Second and Fourteenth Amendments to the United States Constitution under a theory that a state actor has violated the fundamental rights of the Plaintiffs, actionable under 42 U.S.C. §§ 1983 and 1988. In addition to prospective injunctive relief, Plaintiffs-Appellants seek declaratory relief, over which the trial court and this Court have jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202. As this action arises under the United States Constitution, the trial court and this Court have jurisdiction pursuant to 28 U.S.C. § 1331. Appellate jurisdiction is based on 28 U.S.C. § 1291. The final Order appealed from was filed May 7, 2015 and the Notice of Appeal was filed June 5, 2015. [ER 3:5 & ER 1:1].

## STATEMENT OF THE ISSUES

Do Plaintiffs have standing, without actually risking prosecution, to challenge a Washington penal statute that criminalizes their previous and desired future conduct when that conduct is necessary to exercise a fundamental constitutional right?

## ADDENDUM OF STATUTES

Pertinent statutes are contained in an addendum at the end of this brief and references to the addendum in this brief are identified by "ADD".

## STATEMENT OF THE FACTS

### A. Plaintiffs Regularly Engaged in the Temporary Non-Commercial Transfer of Firearms As a Necessary Part of Their Lives and Businesses Prior to the Passage of I-594

Plaintiffs have historically engaged in the repetitive and temporary non-commercial transfer of firearms to exercise their Second Amendment rights. These temporary non-commercial transfers are essential to increase personal safety, protect others, teach the operation of a firearm, safety instruction, and abide by Washington law. *See* [ER 4:15-22 at ¶¶ 5-15]. These temporary non-commercial transfers do not include sales of firearms or other permanent changes in possession, such as gifts. Specifically, prior to I-594 becoming law, Plaintiffs had frequently engaged in temporary non-commercial transfers that involved repeated sharing, loans, and safety checks of firearms between individuals. For example:

Plaintiff Northwest School of Safety provides foundational firearm safety classes to women ranging in age from their teens to their 70s. [ER 4:15-16 at ¶ 5]. Classes take place at the instructor's residence to ensure a non-threatening environment for beginning students who may be nervous about handling firearms. At Northwest School of Safety's classes, firearms were frequently transferred between the instructor and students to teach the non-firing fundamentals of grip, safe handling, loading, and addressing malfunctions. The

Northwest School of Safety had also purchased two .22 caliber pistols for use by students without their own firearms and intended to provide the additional opportunity to live-fire a small caliber, low recoil, firearm while learning about stance, sight alignment, and smooth trigger press.

Plaintiff Puget Sound Security is a licensed private security company. [ER 4:16-17 at ¶ 6]. By Washington law, Puget Sound Security is required to own or lease the firearms used by its employees. *See* RCW 18.170.050; [ADD-11]. Those employees who carry firearms on duty are required to acquire an armed private security guard license that includes firearm certification. Puget Sound Security owns 12 firearms for 300 employees, which can require multiple changes in possession of any given company firearm throughout a day.

Darryl Lee and Xee "Daisy" Del Real are a cohabitating couple. [ER 4:18 at ¶ 9]. Darryl Lee and Daisy Del Real both have valid concealed pistol licenses. The couple shares a firearm that they keep in their home, which they maintain for the purpose of their joint self-defense.

## B. I-594 Criminalized The Non-Commercial Transfers In Which Plaintiffs Regularly Engaged

I-594 was passed in November 2014 to extend background checks to, among other things, non-commercial transfers of firearms in the state of Washington. I-594 included, among other provisions, the following amendments to RCW 9.41.010, RCW 9.41.092, RCW 9.41.113, and RCW 9.41.115:

a) Defining "Transfer" to mean "the intended delivery of a firearm to another person without consideration of payment or promise of payment, including, but not limited to, gifts and loans."

b) Defining "Person" to mean "any individual, corporation, company, association, firm, partnership, club, organization, society, joint stock company, or other legal entity."

c) Requiring that all firearm transfers shall be subject to background checks, and where neither party is a licensed dealer, the transfer must be accomplished at a licensed dealer (who may charge a fee for facilitation costs).

d) Prohibiting a licensed dealer from delivering a firearm to a transferee until the earlier of a cleared background check or ten business days elapsing.

e) Making the violation of the chapter a gross misdemeanor for a first offense and a class C felony for subsequent offenses.

f) Exempting the following transfers from the licensed dealer requirement: bona fide gifts between immediate family members; temporary transfers only so long as necessary to prevent imminent death or great bodily harm; temporary transfers to/from gunsmiths for the purpose of service or repair; temporary transfers between spouses or domestic partners; certain

temporary transfers at shooting ranges, organized competitions, and hunting outings; certain temporary transfers to minors; and certain transfers by the operation of law.

g) Exempting law enforcement officers acting in their official duties.

*See* [ADD-1 to -10].

Notably, unlike similar statutes passed in other states, I-594 did not contain a grace period for temporary non-commercial transfers that do not last longer than some set time period (*e.g.*, 30 days in California – *see* CAL. PENAL § 27880). Such a grace period could address some of the unconstitutionally overbroad rules and/or vague definitions contained in I-594. Instead, most temporary non-commercial transfers are not exempted and such transfers must be completed through a licensed dealer, no matter how brief or repetitive the transfer.

## C. Plaintiffs Have Refrained From Engaging in Temporary Non-Commercial Transfers of Firearms Out of a Fear of Prosecution and the Practical Impossibility of Complying with the Law

Plaintiffs wish to resume engaging in the temporary non-commercial transfer of firearms, without threat of prosecution, in the same way that they routinely did prior to the passage of I-594. *See* [ER 4:15-22, 26 & 28-32 at ¶¶ 5-15, 29 & 37-47]. Plaintiffs admit in their complaint that they have refrained from engaging in this previously lawful conduct rather than risk prosecution under the new law. Defendants have neither clarified the law nor contradicted Plaintiffs'

interpretation that the acts in which they wish to engage would be subject to prosecution.

Furthermore, Plaintiffs are unable to even attempt to comply because the desired transfers would be rendered functionally impossible by the cost and time associated with the requirement that every transfer be made at a licensed dealer and subject to resulting fees and waiting periods. *See* [ER 4:30 at ¶ 42]. A typical Northwest School of Safety instructional course involves dozens of temporary transfers, but the process of having to pay for a dealer to hold a firearm for up to ten business days pending a background check whenever that firearm changes hands between an instructor and a student would effectively ban the entire endeavor. The same is true for a cohabitating couple's sharing of a firearm for self-defense on a day-to-day basis, repeated lending of firearms between friends for self-defense, and businesses that are required by state law to own or lease the firearms carried by their employees. In addition, some of Plaintiffs' desired transfers are completely barred by I-594's requirements, including an out-of-state individual's borrowing of a handgun for self-defense while vacationing or visiting friends and relatives in Washington. *See* [ER 4:29-30 at ¶ 40].[2]

---

[2] Federal law prohibits a licensed dealer in Washington from transferring a handgun directly to a non-resident. *See* 18 U.S.C. § 922(b)(3). This restriction

Given I-594's murky regulations and criminal sanctions, Plaintiffs are presented with the impossible choices of: 1) irrationally pedantic compliance with waiting periods and background checks for these temporary non-commercial transfers, which are often impossible to satisfy; 2) guessing wrong and risking prosecution by reading a grace period into the law that is not in the plain text of I-594; or 3) abandoning the practice of temporary non-commercial transfers and foregoing a constitutionally guaranteed right.

**D.  Washington Officials Have Gone Out of Their Way to Refrain from Enforcing I-594 As Written Or Providing Guidance to Citizens On How They May Avoid Prosecution**

Shortly after I-594 passed, the Washington State Patrol, through its spokesman Bob Calkins, announced that the agency was not planning any arrests or citations of individuals planning to protest the passage of I-594 by trading firearms amongst themselves without subjecting the changes in possession to background checks, noting that "We don't think that we could prove that that's a transfer."  *See* [ER 4:25 at ¶ 26].

Apparently disagreeing with Mr. Calkins, the Washington Department of Fish and Wildlife issued its interpretation of I-594, formulated "in close consultation with legal counsel in the Attorney General's Office."  [ER 4:25 at ¶ 27].  The guidance was focused on the Department's hunter education program

---

would thus outlaw non-commercial transfers of a handgun to a non-resident in Washington, even if the handgun is to be carried temporarily for self-defense.

8

and stated, in part, that transfers between the Department's volunteer hunter education instructors and their students are exempt because the instructors are deemed to be agents of the Department, which is in turn exempt as a law enforcement agency. However, that guidance goes on to note that classroom transfers between students would not be exempt, but instructors could avoid liability under I-594 through the legal fiction of taking the firearm from one student and handing it to another student, with the instructor's ritualistic temporary possession as a middle-man making the whole transaction pure.

On December 5, 2014, the Washington Department of Licensing issued a statement that the DOL's Firearms Program would not "provide legal advice or help the public or licensed firearm dealers interpret the firearms statutes found in RCW 9.41 or I-594." [ER 4:25-26 at ¶ 28].

### E. The District Court Dismissed Plaintiffs' Claims for Lack of Standing Without Addressing the Substance of Plaintiffs' Arguments

Plaintiffs filed a Complaint alleging that I-594 impinged on Second Amendment rights and was otherwise void for vagueness. Defendants filed a motion to dismiss on the issue of standing and ripeness.[3] Defendants' motion to dismiss argued that Plaintiffs were not under a genuine threat of imminent prosecution because they were refraining from engaging in non-commercial

---

[3] Defendants' motion was based entirely on what they claim was a lack of injury, and did not question the satisfaction of the other two prongs of the standing analysis: traceability and redressability.

transfers and thus had never been threatened with prosecution. Plaintiffs rebutted, citing the standard in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007), that standing was satisfied because Plaintiffs' own inaction of intentionally refraining from violating the law eliminates the imminent threat of prosecution and establishes injury where the desired activity falls within the ambit of the challenged statute.

The District Court granted the motion to dismiss for lack of Article III standing.[4] In doing so, the District Court declined to analyze *MedImmune* or the impossibility Plaintiffs face were they even to attempt to satisfy I-594. Instead, the District Court stated that it was "sympathetic to Plaintiffs that one must actually be prosecuted or under actual or immediate threat of prosecution before the Court may address the constitutionality of a statute. While the fairness of this rule may definitely be questioned, it is beyond the authority of this Court to either vacate or decline to enforce the rule." [ER 3:11].

## SUMMARY OF ARGUMENT

The District Court erred when it applied the standing factors laid out in

---

[4] The District Court declined to reach the question of ripeness because it did not find standing. *See* [ER 3:11 at n.1]. Accordingly, Plaintiffs-Appellants do not address ripeness, although the analysis is generally the same in this context. *See, e.g.*, *MedImmune*, 549 U.S. at 128 n.8 ("[S]tanding and ripeness boil down to the same question in this case."); *Jackson v. City & County of San Francisco,* 829 F. Supp. 2d 867, 872 (N.D. Cal. 2011) ("Defendants' contention that the plaintiffs' claims are not ripe are based on the same basic arguments as their position on standing, and do not provide a separate basis for dismissal.").

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) without attempting to account for Plaintiffs' intentional choice to refrain from violating the challenged statute. As clarified by the Supreme Court in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) and in numerous Ninth Circuit cases, standing is satisfied where refraining from violating the law eliminates the imminent threat of prosecution that would have existed where a Plaintiffs' desired activity is criminalized by the challenged statute.

## STANDARD OF REVIEW

A district court order dismissing a complaint pursuant to Fed. R. Civ. P. 12(b)(1) is reviewed *de novo*; and the appellate court must accept all uncontroverted factual assertions regarding jurisdiction as true. *McGraw v. United States*, 281 F.3d 997, 1001 (9th Cir. 2002), *amended* 298 F.3d 754; *King County v. Rasmussen*, 299 F.3d 1077, 1088 (9th Cir. 2002).

## ARGUMENT

**I.  THE PLAINTIFFS HAVE STANDING BECAUSE THEY INTENTIONALLY REFRAIN FROM ENGAGING IN ACTIVITY THAT WOULD OTHERWISE BE SUBJECT TO PROSECUTION**

### A.  Standing Analysis Differs Where a Plaintiff Specifically Refrains from Violating the Law

The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, among other things, that plaintiffs have

standing. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication, and requires, in part, a showing of an injury-in-fact, which is an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Courts have applied myriad tests to determine how a plaintiff may establish standing in any given situation, but all share the goal of ensuring that the court is presented with a concrete and actual injury rather than a "generally available grievance about government." *See, e.g.*, *id.* at 573-576 (collecting cases where plaintiffs complained generally about government decisions—i.e. the process by which laws were enacted, government funds were expended, or how criminal punishments were carried out—even though the government acts had no appreciable impact on the plaintiff).

In pre-enforcement challenges to criminal statutes, courts in the Ninth Circuit have typically attempted to differentiate between generalized grievances and concrete injuries by inquiring whether there is a "genuine threat of imminent prosecution." *See, e.g.*, *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). The theory is that if an individual is not under a threat of imminent prosecution, then they have suffered no injury and

are simply raising a theoretical challenge to the statute. *Id.* In determining whether there is a genuine threat of imminent prosecution, courts have looked to "[1] whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Id.* at 1139. Plaintiffs do not deny that the imminent prosecution test and the *Thomas* factors are applied in the majority of pre-enforcement cases in the Ninth Circuit, specifically those in which a plaintiff has violated or plans to violate the law and has yet to be prosecuted. Nonetheless, the test and factors are ill-fitting where, as here, a reasonable person plans to forego behavior in which they have previously engaged and would otherwise prospectively engage, but for the fear of prosecution.

The typical approach to standing analysis must be altered when addressing a plaintiff who is refraining from engaging in conduct:

> [W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction. . . . That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. The dilemma posed by that coercion—putting the challenger to the choice between abandoning

his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (citations omitted). In these situations, an injury is established by showing that a fear of prosecution is credible because the plaintiff's desired behavior falls within the statute's reach. *Id.* However, a prosecution need not be imminent nor specifically threatened as to the plaintiff in order to establish an injury. *Id.* To hold otherwise would provide the Government with a pocket veto over any pre-enforcement litigation against law-abiding citizens. *See id.* (reviewing the Court's pre-enforcement jurisprudence); *accord Arizona Right to Life Political Action v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003) ("[W]e observe that it would turn respect for the law on its head for us to conclude that [plaintiff] lacks standing to challenge the provision merely because [plaintiff] chose to comply with the statute and challenge its constitutionality, rather than to violate the law and await an enforcement action.").

Ninth Circuit cases, including some relied upon by the Defendants before the District Court, have acknowledged the ill-fitting inapplicability of the rigid *Thomas* factors in some situations. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1013-16 & n.5 (9th Cir. 2013) (holding that plaintiffs had standing to challenge a statute without being directly threatened with prosecution so long as there was a reasonable likelihood that the statute could be enforced against

them); *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1000-01 (9th Cir. 2010) (holding that refraining from engaging in First Amendment activity for fear of prosecution under the challenged statute satisfies standing as long as the intended activity "arguably falls within the statute's reach"); *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093-94 (9th Cir. 2003) (reversing dismissal on standing grounds because the district court's strict application of the *Thomas* factors did not overrule the "validity of pre-enforcement challenges to statutes infringing upon constitutional rights"). As noted in these Ninth Circuit cases, the "genuine threat of imminent prosecution" test and the *Thomas* factors are only one means to the end of determining whether the plaintiff's claims are a mere generalized grievance or an actual injury. *See Valle del Sol*, 732 F.3d at 1015 & n.5; *Human Life*, 624 F.3d at 1000; *California Pro-Life*, 328 at 1093-94. However, neither the "genuine threat of imminent prosecution" test nor the *Thomas* factors are particularly useful when addressing plaintiffs who chose to refrain from violating the law. *See Human Life*, 624 F.3d at 1000-01. Instead, the plaintiff's injury should be determined by foregoing the generalized "genuine threat of imminent prosecution" test in favor of analyzing whether the activity from which the plaintiff intentionally refrained falls within the ambit of the challenged statute

and thus motivated compliance through a well-founded fear of being subject to enforcement. *See id.*

Notably, while many of the cases which forego the strict application of the "genuine threat of imminent prosecution" test involve the chilling of First Amendment rights, the analysis is not limited to that context. *See, e.g.*, *MedImmune*, 549 U.S. at 128-29 (identifying, for example, a non-First Amendment case in which a farmer was granted standing to challenge an anti-alien land law even though he was refraining from violating the law). While chilled speech may be a prime example of standing in this arena, the central issue is whether a plaintiff has suffered an injury by being coerced into refraining from exercising a right out of a genuine fear that the desired act would be subject to prosecution if it were carried out. *See, e.g.*, *California Pro-Life Council*, 328 F.3d at 1094 (noting that *Thomas* did not overrule "precedent recognizing the validity of pre-enforcement challenges to statutes infringing upon constitutional rights" which has most often, but not exclusively, occurred in the First Amendment context). Thus, the question for the Court is whether the individuals challenging the statute have alleged a credible threat of prosecution were they to engage in their desired activity.

Moreover, even if chilled constitutional rights were a prerequisite, Second Amendment jurisprudence has progressed significantly over the past 20 years to

mirror First Amendment claims in this area. *Compare San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1124-45 (9th Cir. 1996) (denying standing to challenge the assault weapons ban in a three sentence explanation that no individual could establish standing under the Second Amendment because it protected collective rights), *with District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (analogizing to the First Amendment to hold that the Second Amendment conveys an individual right rather than a collective one), *and U.S. v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (looking to the First Amendment as a guide in determining the appropriate level of scrutiny to apply in a constitutional challenge). Accordingly, where a plaintiff's Second Amendment rights are chilled because they are forced to forego them or face prosecution, standing analysis under the First and Second Amendments should be identical. For example, in *Ezell v. City of Chicago*, the Seventh Circuit was required to conduct a standing analysis in a pre-enforcement challenge to an ordinance requiring range training as a prerequisite for lawful gun ownership, yet prohibiting all firing ranges from the city. *See* 651 F.3d 694, 695-96 (7th Cir. 2011). In doing so, the Seventh Circuit relied on First Amendment jurisprudence to fill in the gaps of an emerging Second Amendment body of law. *See id.* at 699, 702-03 & 706-07 (applying First Amendment irreparable harm and scrutiny analysis to the Second Amendment claims).

*Jackson v. City & County of San Francisco*, is instructive in the proper way to address a pre-enforcement challenge of a statute that infringes Second Amendment rights. 829 F. Supp. 2d 867 (N.D. Cal 2011). In that case, plaintiffs challenged an ordinance requiring, among other things, trigger locks on firearms. *Id.* at 869. Plaintiffs had not violated the trigger lock ordinance nor been specifically threatened with prosecution. *Id.* at 872. Despite those facts, the court held that the plaintiffs were injured by the ordinance because it forced them to refrain from following through on their current desire to keep their guns unlocked to enhance their personal safety for potential self-defense:

> Plaintiffs have not merely alleged that they "wish and intend" to violate the ordinances in some vague and unspecified way, at some unknown point in the future. Plaintiffs allege they own guns now, and that based on their personal views of how it would enhance their personal safety, they want to keep their guns unlocked now for potential use in self-defense, and that they wish to acquire prohibited ammunition now for the same purpose. While the time that they will actually use the guns in self-defense is unknown and may never come, that does not undermine the immediacy and concreteness of the injury they have alleged.

*Id.* Thus, the *Jackson* court found standing "[b]ecause plaintiffs have adequately alleged an intent and desire to engage in conduct that is prohibited by the ordinances but which they contend is constitutionally protected." *Id.* at 869. The substantive trigger lock decision in *Jackson* was ultimately affirmed on appeal, although the relevant standing analysis was neither appealed to nor

addressed by this Court.  *See Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), *cert. denied*, 576 U.S. ___, No. 14-704 (June 8, 2015).

**B.    The Plaintiffs Have Suffered a Concrete, Particularized, and Actual Injury**

Plaintiffs have historically engaged in the repetitive and temporary non-commercial transfer of firearms to increase their personal safety, protect others, and abide by Washington law.  [ER 4:15-22 at ¶¶ 5-15].  Plaintiffs currently have possession of firearms that they have temporarily transferred in the past. *Id.*  Plaintiffs desire to immediately and repeatedly continue to engage in the non-commercial transfer of those firearms (with or without a designated state actor present to perform the ritual temporary possession as a sanctioning middle-man).  [ER 4:15-22, 26 & 28-32 at ¶¶ 5-15, 29 & 37-47].  Plaintiffs have refrained from engaging in the desired transfers due to the criminal liability that they would face from I-594. *Id.*

The temporary non-commercial transfers in which Plaintiffs desire to engage appear to qualify as violations on the face of the statute if they are not carried out through a licensed dealer.  Plaintiffs' desired transfers would be "the intended delivery of a firearm to another person without consideration of payment or promise of payment, including, but not limited to, gifts and loans" and they are not included by any of the statute's narrow exceptions. *Compare* RCW 9.41.010 (defining "transfer") *and* RCW 9.41.113 (providing narrow

exceptions), *with* [ER 4:15-22, 26 & 28-32 at ¶¶ 5-15, 29 & 37-47] (describing desired transfers). Defendants have not denied that Plaintiffs would be subject to prosecution should Plaintiffs carry through with their desired transfers. Further, even if Plaintiffs were to attempt to comply with the requirements of I-594 by going through licensed dealers, many of Plaintiffs' non-commercial transfers could not be accomplished through I-594's framework for at least two reasons:

- Federal law prohibits a licensed dealer in Washington from transferring a handgun directly to a non-resident, 18 U.S.C. § 922(b)(3), which would make it impossible for a licensed dealer to effectuate a temporary transfer of a handgun involving an out-of-state resident, even if it is to be used or carried temporarily for self-defense. *See* [ER 4:29-30 at ¶ 40].

- Transfers must be accomplished through a licensed dealer, irrespective of whether a previous transfer between the same parties has already been approved. Thus, each transfer results in an administrative fee and the dealer's possession of the firearm for up to ten days. This process renders repetitive transfers prohibitively expensive and time-consuming, at best. It is more likely that repetitive transfers are rendered functionally impossible. Through this process, I-594 effectively bans, among others, a family's sharing of a firearm for self-defense (*i.e.* Darryl

Lee and Daisy Del Real), certain firearm safety courses (*i.e.* Northwest School of Safety and Firearms Academy of Seattle), repeated lending of firearms (*i.e.* Alan Gottlieb, Joe Waldron, Gene Hoffman), and businesses that are required by state law to own or lease the firearms used by their employees on a daily basis (*i.e.* Puget Sound Security and PNAI). *See* [ER 4:30 at ¶ 42].

There is no conjecture here, no hypothetical or uncertain situations, no generalized grievance. Plaintiffs are not individuals who may one day wish to transfer a firearm and are merely unhappy with the existence of a statute that may govern a future theoretical act. Plaintiffs have an immediate and specific desire to engage in a constitutionally protected activity that they have historically undertaken with firearms they currently own, but have been coerced into non-action by the challenged statute that imposes criminal sanctions. I-594 presents a significant impediment to Plaintiffs' present desires to temporarily transfer possession of their firearms, which has disrupted the Plaintiffs' lives, businesses, and travel by forcing them to forgo those transfers. Thus, Plaintiffs have sustained the kind of concrete, particularized, and actual injuries that arise from pre-enforcement litigation. *See, e.g.*, *MedImmune*, 549 U.S. at 128-29 ("The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article

III jurisdiction. . . .  That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced."); *Jackson*, 829 F. Supp. 2d at 872 ("Plaintiffs have adequately alleged an intent and desire to engage in conduct that is prohibited by the ordinances but which they contend is constitutionally protected . . . .").

That Defendants have so far chosen not to enforce I-594 as written, even in the face of intentional violations, does not render Plaintiffs' injury any less concrete, particularized, or actual.  *See* [ER 4:25-26 at ¶ 26-29].  The *Thomas* factors were not created to allow Defendants to prevent review of I-594 by disavowing enforcement or pointing to a lack of enforcement to date.  *See, e.g.*, *Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 1016, 1033-35 (E.D. Cal. 2014) (applying *MedImmune* and collecting cases where standing was found despite a government's reliance on a history of non-enforcement and an "absence of imminent prosecution", so long as the law remained effective and subject to enforcement).  Plaintiffs have alleged that they fear prosecution for acts that appear to fall directly within the range of activities that have been criminalized.  The question is not whether Plaintiffs have been threatened with prosecution, but whether Plaintiffs would be subject to prosecution if they were to carry through with the desired transfers they have specifically articulated. *Accord Valle del Sol*, 732 F.3d at 1013-16 & n.5 (holding that plaintiffs had

standing to challenge a statute without being directly threatened with prosecution so long as there was a reasonable likelihood that the statute could be enforced against them). The answer to the question is yes, and that entitles Plaintiffs to standing to challenge I-594 so that that they may seek to continue engaging in temporary non-commercial transfers without risking prosecution.

## II.  THE DISTRICT COURT ERRED BY REFLEXIVELY APPLYING THE TRADITIONAL STANDING ANALYSIS AND FAILING TO RECONCILE COMPLEMENTARY CASELAW

The District Court granted the motion to dismiss for lack of Article III standing by finding the analysis to be "straightforward": "Plaintiffs explicitly concede that they have no intention of violating I-594, Plaintiffs have failed to allege any specific warning or threat to initiate a prosecution, and Plaintiffs have failed to allege any history of past prosecution or enforcement of I-594. Therefore, under *Thomas*, the Court concludes that Plaintiffs have failed to show a genuine or imminent threat of prosecution and lack standing to bring this challenge to the 'transfer' provision of I-594." [ER 3:10].

In issuing this ruling, the District Court declined to reach beyond the superficial application of the ill-fitting *Thomas* factors. The Court did not analyze *MedImmune* or the impact created by the Plaintiffs' intentional choice to forego their historical non-commercial transfer of firearms. The Court did not address the specific allegations in the Complaint which demonstrate that the

Plaintiffs are currently being injured by their inability to continue specific non-commercial transfers of possession of their currently owned firearms, which is impacting Plaintiffs' lives, businesses, travel, and personal safety. *See* [ER 4:15-22 & 28-32 at ¶¶ 5-15 & 37-47]. The Court did not address how the statute is impossible to satisfy for many Plaintiffs, leaving them with no opportunities to engage in the desired non-commercial transfers without violating the law. *See* [ER 4:29-30 at ¶¶ 40 & 42]. The Court did not discuss how the State's refusal to enforce the law as written has further buttressed the Plaintiffs' conclusion that they must refrain from engaging in any non-commercial transfers that are not explicitly exempted, or be subject to prosecution. *See* [ER 4:31-33 at ¶¶ 44-48]. Instead, the Court found only that the *Thomas* factors are not satisfied because Plaintiffs chose to be law abiding citizens and that the only way they can gain standing is to violate the law. [ER 3:10-11].

Admittedly, Plaintiffs' argument against Defendants' central reliance on *San Diego County Gun Rights Comm. v. Reno*—namely that the case was undermined, if not overruled, by the combination of *Heller* and *MedImmune*—appears to have convinced the District Court that it was required to choose between the parties' positions rather than reconcile them. Indeed, the District Court found that although *Jackson* and its synthesis of *MedImmune*'s impact on Ninth Circuit standing in Second Amendment cases could serve as persuasive

authority, it could not "apply any legal framework other than that set forth in *Thomas*." [ER 3:10]. This is a misconception that went uncorrected when the District Court did not hold oral argument on the motion to dismiss. Although *Thomas* may remain good law after *San Diego County Gun Rights Comm.* has been undermined or overruled, the discussion of standing above demonstrates that the *Thomas* factors are nothing more than one means to show injury—albeit a means that is nearly useless in cases like this.

Plaintiffs' injuries are plainly alleged in the Complaint, but the District Court's "straightforward" application of *Thomas* indicated a lack of standing nonetheless. The District Court acknowledged that the fairness of the rule "may definitely be questioned," but failed to reconcile *MedImmune* and similar cases which have eliminated that concern. [ER 3:11]. While Plaintiffs appreciate that the District Court believes it was required to find a lack of standing, its sympathy is misplaced. Ninth Circuit and Supreme Court precedent clearly provide avenues by which a plaintiff may establish standing without raising the specter of prosecution, and those avenues should be applied in this case.

## CONCLUSION

The Order Granting Defendants' Motion to Dismiss must be reversed and the case remanded with instructions to permit the case to move forward through discovery and trial if necessary.

Respectfully submitted this 14th day of September, 2015.

/s/ Steven W. Fogg
Steven W. Fogg, WSBA #23528
David B. Edwards, WSBA #44680


/s/ Donald E. J. Kilmer
Donald E. J. Kilmer, Jr., CA #179986


/s/ Mikolaj T. Tempski
Mikolaj T. Tempski, WSBA #42896

*Attorneys for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are not aware of any pending cases in the Western District of Washington or the Ninth Circuit that could be related to this Action.

# STATUTORY ADDENDUM

**Page**

Washington RCW 9.41.010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-1

Washington RCW 9.41.092 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-6

Washington RCW 9.41.113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-7

Washington RCW 9.41.115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-10

Washington RCW 18.165.060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-11

Washington RCW 18.170.050 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-11

**Washington RCW 9.41.010**

**Washington RCW 9.41.010 – Terms defined.**

Unless the context clearly requires otherwise, the definitions in this section apply throughout this chapter.

(1) "Antique firearm" means a firearm or replica of a firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898, including any matchlock, flintlock, percussion cap, or similar type of ignition system and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(2) "Barrel length" means the distance from the bolt face of a closed action down the length of the axis of the bore to the crown of the muzzle, or in the case of a barrel with attachments to the end of any legal device permanently attached to the end of the muzzle.

(3) "Crime of violence" means:

> (a) Any of the following felonies, as now existing or hereafter amended: Any felony defined under any law as a class A felony or an attempt to commit a class A felony, criminal solicitation of or criminal conspiracy to commit a class A felony, manslaughter in the first degree, manslaughter in the second degree, indecent liberties if committed by forcible compulsion, kidnapping in the second degree, arson in the second degree, assault in the second degree, assault of a child in the second degree, extortion in the first degree, burglary in the second degree, residential burglary, and robbery in the second degree;

> (b) Any conviction for a felony offense in effect at any time prior to June 6, 1996, which is comparable to a felony classified as a crime of violence in (a) of this subsection; and

> (c) Any federal or out-of-state conviction for an offense comparable to a felony classified as a crime of violence under (a) or (b) of this subsection.

(4) "Dealer" means a person engaged in the business of selling firearms at wholesale or retail who has, or is required to have, a federal firearms license under 18 U.S.C. Sec. 923(a). A person who does not have, and is not required to have, a

federal firearms license under 18 U.S.C. Sec. 923(a), is not a dealer if that person makes only occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or sells all or part of his or her personal collection of firearms.

(5) "Family or household member" means "family" or "household member" as used in RCW 10.99.020.

(6) "Felony" means any felony offense under the laws of this state or any federal or out-of-state offense comparable to a felony offense under the laws of this state.

(7) "Felony firearm offender" means a person who has previously been convicted or found not guilty by reason of insanity in this state of any felony firearm offense. A person is not a felony firearm offender under this chapter if any and all qualifying offenses have been the subject of an expungement, pardon, annulment, certificate, or rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted or a pardon, annulment, or other equivalent procedure based on a finding of innocence.

(8) "Felony firearm offense" means:

   (a) Any felony offense that is a violation of this chapter;

   (b) A violation of RCW 9A.36.045;

   (c) A violation of RCW 9A.56.300;

   (d) A violation of RCW 9A.56.310;

   (e) Any felony offense if the offender was armed with a firearm in the commission of the offense.

(9) "Firearm" means a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder.

(10) "Gun" has the same meaning as firearm.

(11) "Law enforcement officer" includes a general authority Washington peace officer as defined in RCW 10.93.020, or a specially commissioned Washington peace officer as defined in RCW 10.93.020. "Law enforcement officer" also

includes a limited authority Washington peace officer as defined in RCW 10.93.020 if such officer is duly authorized by his or her employer to carry a concealed pistol.

(12) "Lawful permanent resident" has the same meaning afforded a person "lawfully admitted for permanent residence" in 8 U.S.C. Sec. 1101(a)(20).

(13) "Licensed dealer" means a person who is federally licensed under 18 U.S.C. Sec. 923(a).

(14) "Loaded" means:

> (a) There is a cartridge in the chamber of the firearm;

> (b) Cartridges are in a clip that is locked in place in the firearm;

> (c) There is a cartridge in the cylinder of the firearm, if the firearm is a revolver;

> (d) There is a cartridge in the tube or magazine that is inserted in the action; or

> (e) There is a ball in the barrel and the firearm is capped or primed if the firearm is a muzzle loader.

(15) "Machine gun" means any firearm known as a machine gun, mechanical rifle, submachine gun, or any other mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

(16) "Nonimmigrant alien" means a person defined as such in 8 U.S.C. Sec. 1101(a)(15).

(17) "Person" means any individual, corporation, company, association, firm, partnership, club, organization, society, joint stock company, or other legal entity.

(18) "Pistol" means any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand.

(19) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(20) "Sale" and "sell" mean the actual approval of the delivery of a firearm in consideration of payment or promise of payment.

(21) "Serious offense" means any of the following felonies or a felony attempt to commit any of the following felonies, as now existing or hereafter amended:

    (a) Any crime of violence;

    (b) Any felony violation of the uniform controlled substances act, chapter 69.50 RCW, that is classified as a class B felony or that has a maximum term of imprisonment of at least ten years;

    (c) Child molestation in the second degree;

    (d) Incest when committed against a child under age fourteen;

    (e) Indecent liberties;

    (f) Leading organized crime;

    (g) Promoting prostitution in the first degree;

    (h) Rape in the third degree;

    (i) Drive-by shooting;

    (j) Sexual exploitation;

    (k) Vehicular assault, when caused by the operation or driving of a vehicle by a person while under the influence of intoxicating liquor or any drug or by the operation or driving of a vehicle in a reckless manner;

(l) Vehicular homicide, when proximately caused by the driving of any vehicle by any person while under the influence of intoxicating liquor or any drug as defined by RCW 46.61.502, or by the operation of any vehicle in a reckless manner;

(m) Any other class B felony offense with a finding of sexual motivation, as "sexual motivation" is defined under RCW 9.94A.030;

(n) Any other felony with a deadly weapon verdict under RCW 9.94A.825;

(o) Any felony offense in effect at any time prior to June 6, 1996, that is comparable to a serious offense, or any federal or out-of-state conviction for an offense that under the laws of this state would be a felony classified as a serious offense; or

(p) Any felony conviction under RCW 9.41.115.

(22) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(23) "Short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(24) "Shotgun" means a weapon with one or more barrels, designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(25) "Transfer" means the intended delivery of a firearm to another person without consideration of payment or promise of payment including, but not limited to, gifts and loans.

(26) "Unlicensed person" means any person who is not a licensed dealer under this chapter.

**Washington RCW 9.41.092**

**Washington RCW 9.41.092 – Licensed dealer deliveries—Background checks.**

Except as otherwise provided in this chapter, a licensed dealer may not deliver any firearm to a purchaser or transferee until the earlier of:

(1) The results of all required background checks are known and the purchaser or transferee is not prohibited from owning or possessing a firearm under federal or state law; or

(2) Ten business days have elapsed from the date the licensed dealer requested the background check. However, for sales and transfers of pistols if the purchaser or transferee does not have a valid permanent Washington driver's license or state identification card or has not been a resident of the state for the previous consecutive ninety days, then the time period in this subsection shall be extended from ten business days to sixty days.

**Washington RCW 9.41.113**

**Washington RCW 9.41.113 – Firearm sales or transfers—Background checks—Requirements—Exceptions**

(1) All firearm sales or transfers, in whole or part in this state including without limitation a sale or transfer where either the purchaser or seller or transferee or transferor is in Washington, shall be subject to background checks unless specifically exempted by state or federal law. The background check requirement applies to all sales or transfers including, but not limited to, sales and transfers through a licensed dealer, at gun shows, online, and between unlicensed persons.

(2) No person shall sell or transfer a firearm unless:

    (a) The person is a licensed dealer;

    (b) The purchaser or transferee is a licensed dealer; or

    (c) The requirements of subsection (3) of this section are met.

(3) Where neither party to a prospective firearms transaction is a licensed dealer, the parties to the transaction shall complete the sale or transfer through a licensed dealer as follows:

    (a) The seller or transferor shall deliver the firearm to a licensed dealer to process the sale or transfer as if it is selling or transferring the firearm from its inventory to the purchaser or transferee, except that the unlicensed seller or transferor may remove the firearm from the business premises of the licensed dealer while the background check is being conducted. If the seller or transferor removes the firearm from the business premises of the licensed dealer while the background check is being conducted, the purchaser or transferee and the seller or transferor shall return to the business premises of the licensed dealer and the seller or transferor shall again deliver the firearm to the licensed dealer prior to completing the sale or transfer.

    (b) Except as provided in (a) of this subsection, the licensed dealer shall comply with all requirements of federal and state law that would apply if the licensed dealer were selling or transferring the firearm from its inventory to the purchaser or transferee, including but not limited to conducting a background check on the prospective purchaser or transferee in accordance with federal and state law requirements and fulfilling all federal and state recordkeeping requirements.

(c) The purchaser or transferee must complete, sign, and submit all federal, state, and local forms necessary to process the required background check to the licensed dealer conducting the background check.

(d) If the results of the background check indicate that the purchaser or transferee is ineligible to possess a firearm, then the licensed dealer shall return the firearm to the seller or transferor.

(e) The licensed dealer may charge a fee that reflects the fair market value of the administrative costs and efforts incurred by the licensed dealer for facilitating the sale or transfer of the firearm.

(4) This section does not apply to:

(a) A transfer between immediate family members, which for this subsection shall be limited to spouses, domestic partners, parents, children, siblings, grandparents, grandchildren, nieces, nephews, first cousins, aunts, and uncles, that is a bona fide gift;

(b) The sale or transfer of an antique firearm;

(c) A temporary transfer of possession of a firearm if such transfer is necessary to prevent imminent death or great bodily harm to the person to whom the firearm is transferred if:

(i) The temporary transfer only lasts as long as immediately necessary to prevent such imminent death or great bodily harm; and

(ii) The person to whom the firearm is transferred is not prohibited from possessing firearms under state or federal law;

(d) Any law enforcement or corrections agency and, to the extent the person is acting within the course and scope of his or her employment or official duties, any law enforcement or corrections officer, United States marshal, member of the armed forces of the United States or the national guard, or federal official;

(e) A federally licensed gunsmith who receives a firearm solely for the purposes of service or repair, or the return of the firearm to its owner by the federally licensed gunsmith;

(f) The temporary transfer of a firearm

(i) between spouses or domestic partners;

(ii) if the temporary transfer occurs, and the firearm is kept at all times, at an established shooting range authorized by the governing body of the jurisdiction in which such range is located;

(iii) if the temporary transfer occurs and the transferee's possession of the firearm is exclusively at a lawful organized competition involving the use of a firearm, or while participating in or practicing for a performance by an organized group that uses firearms as a part of the performance;

(iv) to a person who is under eighteen years of age for lawful hunting, sporting, or educational purposes while under the direct supervision and control of a responsible adult who is not prohibited from possessing firearms; or

(v) while hunting if the hunting is legal in all places where the person to whom the firearm is transferred possesses the firearm and the person to whom the firearm is transferred has completed all training and holds all licenses or permits required for such hunting, provided that any temporary transfer allowed by this subsection is permitted only if the person to whom the firearm is transferred is not prohibited from possessing firearms under state or federal law; or

(g) A person who (i) acquired a firearm other than a pistol by operation of law upon the death of the former owner of the firearm or (ii) acquired a pistol by operation of law upon the death of the former owner of the pistol within the preceding sixty days. At the end of the sixty-day period, the person must either have lawfully transferred the pistol or must have contacted the department of licensing to notify the department that he or she has possession of the pistol and intends to retain possession of the pistol, in compliance with all federal and state laws.

**Washington RCW 9.41.115**

**Washington RCW 9.41.115 – Penalties—Violations of RCW 9.41.113.**

Notwithstanding the penalty provisions in this chapter, any person knowingly violating RCW 9.41.113 is guilty of a gross misdemeanor punishable under chapter 9A.20 RCW. If a person previously has been found guilty under this section, then the person is guilty of a class C felony punishable under chapter 9A.20 RCW for each subsequent knowing violation of RCW 9.41.113. A person is guilty of a separate offense for each and every gun sold or transferred without complying with the background check requirements of RCW 9.41.113. It is an affirmative defense to any prosecution brought under this section that the sale or transfer satisfied one of the exceptions in RCW 9.41.113(4).

**Washington RCW 18.165.060 & 18.170.050**

**Washington RCW 18.165.060 – Armed private investigator license authority—Registration of firearms.**

(1) An armed private investigator license grants authority to the holder, while in the performance of his or her duties, to carry a firearm with which the holder has met the proficiency requirements established by the commission.

(2) All firearms carried by armed private investigators in the performance of their duties must be owned by the employer and, if required by law, must be registered with the proper government agency.

**Washington RCW 18.170.050 – Armed private security guard license authority—Registration of firearms.**

(1) An armed private security guard license grants authority to the holder, while in the performance of his or her duties, to carry a firearm with which the holder has met the proficiency requirements established by the commission.

(2) All firearms carried by armed private security guards in the performance of their duties must be owned or leased by the employer and, if required by law, must be registered with the proper government agency.

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the

Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using

the appellate CM/ECF system.  Participants in the case are registered CM/ECF

users and service will be accomplished by the appellate CM/ECF system.


DATED this 14th day of September, 2015.


 */s/ Christy A. Nelson*
Christy A. Nelson